[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
The plaintiff, Carol Ward, brought this action against TRC Realty Corporation (TRC) and Charles Nader (Nader) with a five-count complaint. The defendants answered separately denying the allegations recited in the plaintiff's complaint.
Based on a fair preponderance of the evidence introduced at trial, the court finds the following facts: the plaintiff, Carol Ward, is a school teacher who obtained her real estate license and worked part-time as a listing agent for Century 21 in 1984 and 1985. As such, Ward procured listings for around one dozen residences resulting in approximately three sales by real estate brokers. For her services Ward was paid co-brokerage fees. Additionally, in 1985, while at work on her own, Ward received a $30,000 finder's fee as a result of procuring a purchaser for a large apartment complex. Because CT Page 6628 of the size of the fee, Ward hired a Bloomfield accounting firm to prepare her income tax return and give her investment service advice.
In February 1986, Ward met an employee of Nader. Unsolicited, Ward mentioned a tract of land available for sale in Enfield for which she hoped to receive a finder's fee. Ward met with Nader to discuss a possible deal. Ward was impressed by Nader's office decor as well as his talk about his other business ventures. Although Nader had his attorney prepare a written proposal for the Enfield property, the deal was never finalized. Nader inquired of Ward about other properties in which he and his "investors" might be interested. Although Ward presented several possibilities to Nader, nothing resulted. However, as a result of Ward's solicitation of Nader's business, she became aware of the condominium complex in Waterbury.
In the fall of 1986, Ward anticipated receiving a large finder's fee from the sale of a condominium complex in Southington, where she now lives and owns a unit. Ward then contacted Nader and requested that he prepare her tax return and advise her as to what to do with her $84,000 finder's fee. No evidence was introduced, however, establishing any terms under which Nader was retained. Ward was neither billed for nor paid for any investment advice. In fact, there was no evidence as to investment advice given by Nader, appropriate or inappropriate.
Nader prepared Ward's 1986 and 1987 tax returns and charged her for his services. Although Nader also advised Ward to pay off her bills, that did not constitute investment advice. In fact, the advice was the result of friendly conversation for which she did not expect to be billed. Additionally, Nader also suggested that Ward invest her money by purchasing a condominium unit in the project he was developing in Waterbury. While Ward insisted that she wanted a conservative investment and that the money was very important to her, she also expressed a desire to profit from any investment. Only after Ward had discussed with Nader the possibility of earning a commission either from the sale of the entire complex or individual units in the complex, did she purchase a condominium unit.
In the course of discussion, Nader told Ward that he would handle every aspect of the sale of the unit and expressed his expectation that it could be resold in three months, thereby doubling her investment.
Per Nader's suggestion, Ward also loaned Nader $20,000, CT Page 6629 as a means by which to make more money on interest than from a savings institution.
Nader did not ordinarily provide investment advice. His functions as a financial advisor were limited to corporations in the areas of bookkeeping and inventory control. His tax preparation work was limited to friends and individuals affiliated with companies to whom he provided financial advice. Ward was such an individual.
Prior to signing the contract of sale, Nader gave Ward printed brochures [Ex. B and C] for Eastwood Condominiums. These brochures described several amenities and benefits of the complex. Nothing in the brochures was labeled "Not to be built." Nader also gave Ward an initial Public Offering Statement [Ex. GG] which listed 245 condominium units in the project.
On August 31, 1987 Ward entered into a contract of sale [Ex. D] with TRC, of which Nader is president, for the purchase of unit 202 in Building No. Two of Eastwood Condominium. The closing date was originally set for October 5, 1987 but was postponed to January 8, 1988 with Ward's knowledge. The purchase price was $92,500. Ward gave Nader a down payment of $23,125 [Ex. E].
While Nader helped Ward make some of the mortgage arrangements with Dime Savings Bank (the pre-approved lender for the project), no evidence was introduced to prove he controlled the transaction. Ward signed the application and paid the mortgage fee. Her credit, not Nader's, was assessed in the bank's decision to grant the loan. On approximately the same date, Ward obtained a mortgage for her Southington condominium without any help from Nader. Ward was knowledgeable about the real estate market.
Prior to the closing, Ward received an Appraisal Report [Ex. H] reading "101 Units on deposit". She also received a printout projection for the year ending November 30, 1987 [Ex. SS] citing an income projection of $12 million with a profit of over $2 million. These documents are merely income projections, not the sole basis of an investment decision.
At the closing on January 8, 1988, Ward received a deed from TRC (by Nader). Ward was represented individually at the closing by Attorney Griffin. (TRC and Dime Savings Bank were also separately represented.) While Ward did not know nor meet with Griffin prior to the closing, she paid his attorney's fees and gave him a blank check at the closing for adjustments and fees. CT Page 6630
Although Ward claimed that her understanding of a waive of common charges weighed in her decision to purchase the unit no evidence was introduced to support this claim. Ward paid the common charges on demand without protest. While she subsequently stopped payment and issued a new check with a letter of protest, that letter did not refer to a supposed waiver of charges.
The original closing date of October 5, 1957 was postponed to January 8, 1988. She had the opportunity to cancel the agreement but did not do so. While Ward claimed that Nader personally agreed to repurchase the unit from her in the event the unit did not resell, there was no evidence supporting that claim.
Ward had ample opportunity to inspect the project before the purchase. She inspected the complex subsequent to the date of the contract of sale and prior to the closing and was satisfied with the progress of the project. She inspected her unit in March 1988 and was satisfied with the work. There was no evidence as to the damages she sustained as a result of any defects or delay in the improvements in the common area, nor were witnesses called to testify as to diminution of value.
Despite Ward's failure to introduce evidence in support of her claim of fraudulent misrepresentation, she did introduce evidence to support a showing of TRC's violation of several sections of the Common Interest Ownership Act (Conn. Gen. Stat. 47-200-293). The original Declaration of Condominium was not recorded until September 18, 1987, almost one month after the parties had signed the contract of sale on August 31, 1987. An amendment to the Declaration dated February 8, 1988 (one month after the closing) was not attached or recorded with the original Declaration as required by Conn. Gen. Stat. 47-269. At or after the closing, Ward received another Public Offering Statement [Ex. LL] which reduced the number of units from 245 to 98.
According to Carl Pelletier, a Waterbury building official, a Certificate of Occupancy was needed for a conversion from an apartment to a condominium. Such a certificate could not be issued for Eastwood Condominium because of noncompliance with building code requirements. These facts are supported further by testimony of Waterbury Deputy Fire Marshall Robert Pelletier who stated that the complex could only be viewed as consisting of apartments because of fire and building code violations.
Ward also claimed that TRC and Nader, as an individual, CT Page 6631 breached the express and implied warranties of quality pursuant to Conn. Gen. Stat. 47-274, 275. Although TRC acted in those capacities, Nader was neither a seller nor declarant within the meaning of the statute.
Regardless of the defect in the recordation of the Declaration of Condominium, the evidence introduced did not support Ward's claim of fraudulent inducement. She continued to maintain an ongoing business relationship with Nader through June 1988, which included payment of a $700 fee to Nader's Full Service Realty Co. to find a tenant for her Waterbury condominium unit.
In 1988 and 1989, Ward's attempts to sell the unit both individually and through brokers were unsuccessful. Ultimately, Ward became unable to carry the condominium payments. On January 27, 1990, Ward quit-claimed her condominium unit to the Dime Savings Bank in lieu of foreclosure.
Legal Analysis
COUNT ONE
In the first count of plaintiff Ward's "amended re-revised" complaint, directed to Nader, the plaintiff alleges that she employed Nader to prepare her tax returns, and to "act as her financial advisor and tax planner." The plaintiff further alleges that, in connection with the relationship as financial planner, Nader advised Ward to invest in the purchase of a unit at Eastwood Condominiums in Waterbury, a condominium owned by defendant TRC Realty Corp. (TRC), in which Nader disclosed himself as a principal. Specifically, the Plaintiff alleges that:
 15. Nader, in violation of the duty owed to the plaintiff, neglected to provide her with proper advice in making this investment insofar as the condominium unit was not a proper investment for conservative growth goals.
 16. Due to the neglect of defendant Nader, plaintiff was induced to make an investment unsuitable for her needs and has been injured by said investment insofar as she has lost the value of her investment, incurred the obligation and expenses of the mortgage, and has suffered related monetary damages, as well as emotional distress.
In her brief, the plaintiff characterizes the first CT Page 6632 count as an action for "improper advice", while the defendant, Nader, characterizes it as an action for professional malpractice. The plaintiff, however, further characterizes her complaint in her reply brief as "in the nature of breach of trust or fiduciary duty and fraud, and fraud, and statutory violations, rather than strict professional malpractice." (Emphasis added.)
"One standing in a fiduciary relation with another is subject to liability to the other for harm resulting from a breach of duty imposed by the relation." Restatement (Second) of Torts 874 (1977). "A fiduciary relation exists between two persons when one of them is under a duty to act for or to give advice for the benefit of another upon matters within the scope of the relation." Restatement (Second) of Torts 874 comment a (1977). "A fiduciary or confidential relationship is characterized by a unique degree of trust and confidence between the parties, one of whom has superior knowledge, skill or expertise and is under a duty to represent the interests of the other." (Citation omitted). Dunham v. Dunham, 204 Conn. 303,322, 528 A.2d 1123 (1987). "The superior position of the fiduciary or dominant party affords him great opportunity for abuse of the confidence reposed in him." (Citations omitted.) Id.
In order to determine whether a fiduciary relationship has been created,
 [i]t is not always necessary to enter into meticulous definitions of the relation, or seek to determine whether it arose by an express or implied contract between the parties, or whether the defendant should be treated as estopped by his conduct from denying that the relation existed. The relation need not arise from an express appointment and an acceptance, but is often established from the words and conduct of the parties and the circumstances of the particular case.
Kurtz v. Farrington, 104 Conn. 257, 269, 132 A. 540 (1926); see also Licari v. Blackwelder, 14 Conn. App. 46, 53, 539 A.2d 609
(1988). The Connecticut Supreme Court has:
 specifically refused to define `a fiduciary relationship in precise detail and in such a manner as to exclude new situations,' choosing instead to leave `the bars down for situations in which there is a justifiable trust confided CT Page 6633 on one side and a resulting superiority and influence on the other.'
(Citations omitted.) Alaimo v. Royer, 188 Conn. 36, 41,448 A.2d 207 (1982).
"Where that confidence and trust are abused, equity will intervene to remedy the wrong done, although the law would otherwise leave the parties where it finds them. (Citations omitted).) Cohen v. Cohen, 182 Conn. 193, 204, 438 A.2d 55
(1980). "Proof of a fiduciary relationship . . . imposes a twofold burden upon the fiduciary." Dunham, supra. Once the fiduciary relationship is found to exist, the burden of proving fair dealing shifts to the fiduciary. Id., 322; Alaimo, supra, 41. Further, "the standard of proof for establishing fair dealing is not the ordinary standard of fair preponderance of the evidence, but requires proof either by clear and convincing evidence, clear and satisfactory evidence or clear, convincing and unequivocal evidence." Dunham, supra, 322-23; Alaimo, supra, 41.
Based on the court's findings as to the relationship between Ward and Nader, the essential allegations of Count One were not established.
COUNTS TWO AND THREE
The plaintiff Ward characterizes the second and third counts of her complaint as claims for "Fraud and/or Misrepresentation". In the second count of plaintiff Ward's "amended re-revised" complaint she alleges that Nader made false representations in order to induce her to purchase a unit at Eastwood Condominiums. The third count of plaintiff Ward's "amended re-revised" complaint is directed to both Nader and TRC and alleges that Nader, in making the representations about the condominium, was acting on behalf of and for the benefit of TRC.
Fraud is a "deception practiced in order to induce another to part with property or to surrender some legal right." Jucker v. Jucker, 190 Conn. 674, 678, 461 A.2d 1384
(1983). The essential elements of an action in fraud are: "(1) that a false representation was made as a statement of fact; (2) that it was untrue and known to be untrue by the party making it; (3) that it was made to induce the other party to act on it; and (4) that the latter did so act on it to his injury." Maturo v. Gerard, 196 Conn. 584, 587, 494 A.2d 1199
(1985); Miller v. Appleby, 183 Conn. 51, 54-55, 438 A.2d 811
(1981). "`Fraud and misrepresentation cannot be easily defined because they can be accomplished in so many different ways. CT Page 6634 They present, however, issues of fact.'" Maturo, supra, 587, quoting Hathaway v. Bornmann, 137 Conn. 322, 324, 77 A.2d 91
(1950). The trier of fact is the judge of the credibility of the testimony and the weight to be accorded to it. Maturo, supra, 588; Miller, supra, 55. Fraud is not to be presumed but must be proven by clear and satisfactory evidence. Miller, supra, 55.
False representations, "whether made knowingly, recklessly, negligently or innocently, must be made for the purpose of inducing action upon it." J. Frederick Scholes Agency v. Mitchell, 191 Conn. 353, 359, 464 A.2d 595 (1983). In addition, "where a defendant has special means of knowledge, and a plaintiff can under the circumstances attribute to the former accurate knowledge of what is represented, the plaintiff need not show the actual knowledge or falsity of the representation." Maturo, supra, 588.
Finally, the proper measure of damages in an action for fraud or misrepresentation is "the difference in value between the property as it would have been if there had been no false representation, i.e., `the benefit of the bargain' damages, together with any consequential damages resulting directly from the fraud." Miller, supra, 57.
The plaintiff failed to establish with credible evidence the cause of action alleged in Counts Two and Three.
COUNT FOUR
In the fourth count of her "amended re-revised" complaint, plaintiff Ward alleges that both Nader and TRC violated express and implied warranties conferred by the Common Interest Ownership Act, General Statutes 47-200 et seq. (hereinafter "CIOA"). "CIOA is a detailed statutory scheme governing the creation, organization and management of common interest communities and contemplates the voluntary participation of the owners." Wilcox v. Willard Shopping Center, 208 Conn. 318, 326, 544 A.2d 1207 (1988). CIOA was enacted by the Connecticut legislature in 1984 in order to provide "developers, lenders and title insurers with flexibility and certainty in establishing common interest communities, as well as providing prospective unit owners and unit owners' associations with consumer protection rights such as disclosure and warranty guidelines." Collins v. Townhouse Eighty-Eight Foundation, Inc., 3 Conn. L. Rptr. 88, 89 (January 3, 1991, Aronson, J.), citing Conn. Joint Standing Committee Hearings, Judiciary, Pt. 6, 1983 Sess., pp. 1821-23. CIOA was modeled upon the Uniform Common Interest Ownership Act, 1-1, 7 U.L.A. 231 (Rev., 1992). CT Page 6635
General Statutes 47-274 sets forth the express warranties of quality given to the buyer by the seller pursuant to CIOA:
 Sec. 47-274. Express warranties of quality. (a) Express warranties made by any seller to a purchaser of a unit, if relied on by the purchaser, are created as follows:
 (1) Any affirmation of fact or promise which relates to the unit, its use, or rights appurtenant thereto, area improvements to the common interest community that would directly benefit the unit, or the right to use or have the benefit of facilities not located in the common interest community, creates an express warranty that the unit, area improvements and related rights and uses will conform to the affirmation or promise;
 (2) Any model or description of the physical characteristics of the common interest community, including plans and specifications of or for improvements, creates an express warranty that the common interest community will substantially conform to the model or description;
 (3) Any description of the quantity or extent of the real property comprising the common interest community, including surveys, creates an express warranty that the common interest community will conform to the description, subject to customary tolerances; and
 (4) A provision that a purchaser may put a unit only to a specified use is an express warranty that the specified use is lawful.
 (b) Neither formal words, such as "warranty" or "guarantee", nor a specific intention to make a warranty, are necessary to create an express warranty of quality, but a statement purporting to be merely an opinion or commendation of the real property or its value does not create a warranty.
(c) Any conveyance of a unit transfers CT Page 6636 to the purchaser all express warranties of quality made by previous sellers only to the extent such a conveyance would transfer warranties pursuant to chapter 827.
In addition, General Statutes 47-275 sets forth the implied warranties of quality given to the buyer by the declarant pursuant to CIOA:
 Sec. 47-275. Implied warranties of quality. (a) A declarant warrants to a purchaser that a unit will be in at least as good condition at the earlier of the time of the conveyance or delivery of possession as it was at the time of contracting, reasonable wear and tear excepted.
 (b) A declarant impliedly warrants to a purchaser that unit and the common elements in the common interest community are suitable for the ordinary uses of real property of its type and that any improvements made or contracted for by him, or made by any person before the creation of the common interest community, will be: (1) Free from defective materials; and (2) constructed in accordance with applicable law, according to sound engineering and construction standards, and in a workman-like manner.
 (c) In addition, a declarant warrants to a purchaser of a unit that may be used for residential use that an existing use, continuation of which is contemplated by the parties, does not violate applicable law at the earlier of the time of conveyance or delivery of possession.
 (d) Warranties imposed by this section may be excluded or modified as specified in section 47-276.
 (e) For purposes of this section, improvements made or contracted for by an affiliate of a declarant are made or contracted for by the declarant.
(f) Any conveyance of a unit transfers to CT Page 6637 the purchaser all of the declarant's implied warranties of quality only to the extent such a conveyance would transfer warranties pursuant to chapter 827.
 (g) The warranties provided to a purchaser by a declarant pursuant to this section with respect to common elements shall also extend to the association.
At the present time, there is no case law at either the appellate or superior court level which provides clear guidance in interpreting General Statutes 47-274 and 47-275. However, guidance is provided in the comments to the Uniform Common Interest Ownership Act, 4-111 and 4-112, which are identical to General Statutes 47-274 and 47-275.
With respect to express warranties, the official comment to 4-111 states:
 This section . . . deals with express warranties, that is, with the expectations of the purchaser created by particular conduct of the declarant in connection with inducement of the sale. It is based on the principle that, once it is established that the declarant has acted so as to create particular expectations in the purchaser, warranty should be found unless it is clear that, prior to the time of final agreement, the declarant has negated the conduct which created the expectation.
Uniform Condominium Act, 4-111 (comments), 7 U.L.A. 211 (Rev. 1992). With respect to implied warranties, the official comment to 4-112 states:
 1. This section . . . overturns the rule still applied in many states that a professional seller of real estate makes no implied warranties of quality (the rule of "caveat emptor"). In recent years, that rule has been increasingly recognized as a relic of an earlier age whose continued existence defeats reasonable expectations of purchasers. Since the 1930's, more and more courts have completely or partially abolished the caveat emptor rule, and it is clear that the judicial tide is now running in favor of seller liability.
CT Page 6638
 2. The principal warranty imposed under this section is that of suitability of both the unit and common elements for ordinary uses of real estate of similar type, and of quality of construction. Both of these warranties, which arise under subsection (b), are imposed only against declarants and not against unit owners selling their units to others.
Uniform Condominium Act, 4-112 (comments), 7 U.L.A. 213 (Rev. 1992).
General Statutes 47-202(12) defines the term "declarant" as "any person or group of persons acting in concert who (A) as part of a common promotional plan, offers to dispose of his interest in a unit not previously disposed of or (B) reserves or succeeds any special declarant right." Upon the evidence presented, Nader is neither a seller nor a declarant. The court has found that TRC is a seller and a declarant. Therefore, only TRC is subject to liability under General Statutes 47-274 and 47-275.
General Statutes 47-278 provides a general cause of action or claim for relief for violations of CIOA:
 If a declarant or any other person subject to this chapter fails to comply with any of its provisions or any provision of the declaration or by laws, any person or class of persons adversely affected by the failure to comply has a claim for appropriate relief. Punitive damages may be awarded for a wilful failure to comply with this chapter. The court, in an appropriate case, may award reasonable attorney's fees.
Violations of the Common Interest Ownership Act
At trial, the plaintiff presented evidence on the basis of which the court found that: (1) The original Declaration of Condominium was not recorded until one month after the parties had signed the contract of sale; (2) an amendment to the Declaration dated one month after the closing was not attached or recorded with the original declaration as required by General Statutes 47-269; and (3) a certificate of occupancy was not issued as required by General Statutes 47-281. The plaintiff, however, failed to plead specifically any of the aforementioned violations of CIOA in her "amended re-revised" complaint. In the fourth count, the plaintiff simply CT Page 6639 incorporates the allegations of the preceding three counts and alleges that "the actions taken by defendants constitute violations of express and implied warranties" pursuant to General Statutes 47-424 and 47-425.
"The purpose of the complaint is to limit the issues to be decided at the trial of a case and is calculated to prevent surprise." Farrell v. St. Vincent's Hospital, 203 Conn. 554,557, 525 A.2d 924 (1987). Whether a complaint gives the opposing party "sufficient notice is determined in each case with reference to the character of the wrong complained of and the underlying purpose of the rule which is to prevent surprise upon the defendant." Waterbury Petroleum Products, Inc. v. Canaan Oil Fuel Co., 193 Conn. 208, 224-25 n. 16, 477 A.2d 988
(1984). Finally, the failure to include issues in a complaint precludes recovery by the plaintiff under that complaint. Simsbury Turnpike Realty Co. v. Great Atlantic Pacific Tea Co., 39 Conn. Sup. 367, 369, 465 A.2d 331 (Super.Ct. 1983).
Accordingly, the plaintiff's cause of action under Count Four fails.
COUNT FIVE
The fifth count of plaintiff Ward's "amended re-revised" complaint alleges that Nader and TRC violated the Connecticut Unfair Trade Practices Act (CUTPA) General Statutes42-110a et seq. CUTPA was enacted by the General Assembly in 1973 in order to "encourage litigants to act as private attorneys general and to bring actions for unfair or deceptive trade practices." Hernandez v. Monterey Village Associates Limited Partnership, 17 Conn. App. 421, 425, 553 A.2d 617
(1989). CUTPA is a remedial statute and must be construed liberally in an effort to effectuate its public policy goals. Web Press Services Corporation v. New London Motors, Inc.,203 Conn. 342, 354, 525 A.2d 57 (1987). In addition, interpretations of CUTPA "should be guided by interpretations of the Federal Trade Commission Act, 15 U.S.C. § 45(a)(1), made by federal courts and the Federal Trade Commission." General Statutes 42-110b(b)." Sportsmen's Boating Corporation v. Hensley, 192 Conn. 747, 755-56, 474 A.2d 780 (1984).
General Statutes 42-110b(a) states that: "[n]o person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or practice." In order to determine whether a practice violates CUTPA, the courts utilize the following criteria:
 (1) whether the practice, without necessarily having been previously considered unlawful, CT Page 6640 offends public policy as it has been established by statute, the common law, or otherwise — whether, in other words, it is within at least the penumbra of some common law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers. . . .
(Citations omitted.) Sanghavi v. Paul Revere Life Insurance Co., 214 Conn. 303, 311-12, 572 A.2d 307 (1990); Sportsmen's Boating Corp. v. Hensely, 192 Conn. 747, 474 A.2d 780 (1984). In addition, scienter is not a requirement for the establishment of a CUTPA violation. Eamiello v. Liberty Mobile Home Sales, Inc., 208 Conn. 620, 653, 546 A.2d 805 (1988). Finally, under CUTPA, it is not necessary that a plaintiff prove reliance or that a representation became part of the basis of the bargain. Web Press Services Corp. v. New London Motors Inc., 205 Conn. 479, 483-84, 503 A.2d 1211 (1987). The plaintiff has not established the allegations of the CUTPA Count.
For the foregoing reasons, judgment may enter in favor of the defendants as to all counts of the complaint.
Schaller, J.